Slip Op. 99-70

# UNITED STATES COURT OF INTERNATIONAL TRADE

---

SHAKEPROOF ASSEMBLY COMPONENTS  :
DIVISION OF ILLINOIS TOOL WORKS, INC.,

                     :

           Plaintiff,                        **Court No.  97-12-02066**

                     :           **Before: Barzilay, Judge**

      v.

                     :

UNITED STATES,

                     :

           Defendant.

                     :

---

[Plaintiff's Motion for Judgment Upon an Agency Record granted in part, denied in part.]

Decided: July 29, 1999.

Creskoff & Doram, L.L.P. (Stephen M. Creskoff, Robert T. Hume, Lisa E. Smilan) for Plaintiff.

David W. Ogden, Acting Assistant Attorney General, David M. Cohen, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (Lucius B. Lau), Robert E. Nielsen, Senior Attorney, Office of the Chief Counsel for Import Administration, United States Department of Commerce, of counsel, for Defendant.

## OPINION

**BARZILAY, JUDGE:**

This case is before the Court on Plaintiff's USCIT R. 56.2 Motion for Judgment Upon an Agency Record.  Plaintiff challenges certain aspects of the Department of Commerce, International Trade Administration's ("Commerce" or "ITA") final determination in *Certain Helical Spring Lock Washers from the People's Republic of China; Final Results of Antidumping Duty Administrative Review*, 62 Fed. Reg. 61794-801 (Nov. 19, 1997) ("Final Determination").  Defendant partially opposes Plaintiff's motion,  but agrees that a remand is required to enable Commerce to recalculate

the value for steel scrap by eliminating duplicate total quantity and value figures for the period April 1995 - August 1995. For the reasons that follow the Court remands the case to the agency to explain how the use of import price data for steel wire rod to value all steel wire rod, including domestically sourced rod, promotes accuracy in this case, to recalculate the steel scrap factor by eliminating duplicative data and certain import data which were aberrational and to explain why good cause did not exist to verify the steel wire rod import price information submitted by the respondent. The Court has jurisdiction under 28 U.S.C. § 1581(c) (1994) and 19 U.S.C. § 1516a(a)(2)(B)(iii) (1994).

## I.  INTRODUCTION

The present controversy arises out of the third administrative review conducted by Commerce stemming from an October, 19, 1993, antidumping duty order[1] respecting helical spring lock washers ("washers") from the People's Republic of China. Commerce assigned Hangzhou Spring Washer Plant, subsequently known as Zhejian Wanxin Group, Co. ("ZWG"), a respondent in the original investigation, an individual dumping margin. On November 15, 1996, Commerce initiated the third annual review covering the period October 1, 1995 - September 30, 1996. *See* 61 Fed. Reg. 58513. Commerce published its preliminary determination on July 11, 1997[2] and its Final Determination on November 19, 1997.[3]

No one challenged Commerce's designation of China as a nonmarket economy and so Commerce used a factors of production analysis, pursuant to 19 U.S.C. § 1677b(c) (1994) to

---

[1]  58 Fed. Reg. 53914.

[2]  62 Fed. Reg. 37192.

[3]  62 Fed. Reg. 61794-801.

determine the normal value for the washers produced by ZWG.[4]  Commerce, without objection,

chose India as the appropriate surrogate country pursuant to 19 U.S.C. § 1677b(c)(4).  Plaintiff

challenges Commerce's use of the price paid for steel wire rod imported from the United Kingdom

by ZWG, accounting for 34.7 percent of ZWG's total purchases of steel wire rod during the period

of review ("POR"), to value all steel wire rod.  Additionally, Plaintiff argues that Commerce failed

to verify the price information ZWG submitted and miscalculated the final dumping margin by using

duplicative and aberrational data.

## II.  STANDARD OF REVIEW

In reviewing a challenge to Commerce's determination in an antidumping administrative

review,  the Court is to hold unlawful a determination, finding or conclusion by Commerce that is

unsupported by substantial evidence or otherwise not in accordance with law.  *See* 19 U.S.C. §

1516a(b)(1)(B)(i) (1994).  Substantial evidence is "such relevant evidence as a reasonable mind

might accept to support a conclusion."  *Consolidated Edison v. NLRB*, 305 U.S. 197, 229 (1938);

*accord Matsushita Elec. Indus. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984).

To determine whether Commerce has acted in accordance with law the court must undertake

the two step analysis prescribed by *Chevron U.S.A., Inc. v. Natural Resources Defense Council*, 467

U.S. 837 (1984).  First the court must determine whether the statute speaks to the precise question

---

[4] Normal value in market economy cases is generally the price at which the foreign product is first sold in the exporting country.  *See* 19 U.S.C. § 1677b(a)(1)(B)(i) (1994). However, in nonmarket economies the statute directs Commerce to value the merchandise on the basis of the factors of production.  *See* 19 U.S.C. § 1677b(c) (1994).  The export price (or constructed export price) is generally the price of the merchandise at importation after certain statutory adjustments are made.  *See* 19 U.S.C. §§ 1677a(a)-(b) (1994).  The amount by which the normal value exceeds the export price or constructed export price is the dumping margin. *See* 19 U.S.C. § 1677(35)(A) (1994).

at issue. *See id.* at 842. If the statute is clear or the legislative history unambiguously expresses Congress' intent then the matter is at an end, for the agency cannot contravene the will of Congress. *See id.* at 842-843. Second, if the court determines the statute is silent or ambiguous, the question to be asked is whether the agency's construction of the statute is permissible. *See id.* at 843. Essentially, this is an inquiry into the reasonableness of Commerce's interpretation. *See Fujitsu General Ltd. v. United States*, 88 F.3d 1034, 1038 (Fed. Cir. 1996). Provided Commerce has acted reasonably, the court may not substitute its judgment for the agency's. *See IPSCO, Inc. v. United States*, 965 F.2d 1056, 1061 (Fed. Cir. 1992). Substantial deference is accorded to Commerce's statutory interpretations since the ITA is the "'master' of the antidumping laws." *Torrington Co. v. United States*, 68 F.3d 1347, 1351 (Fed. Cir. 1995).

## III. DISCUSSION

### A. *The Statute Does not Speak to Whether Commerce May Use Import Prices to Value Domestically Purchased Materials.*

Plaintiff argues that the use of import prices to value non-imported material is contrary to law because Congress has addressed the issue in 19 U.S.C. § 1677b(c) by providing for surrogate country values to be used to the extent possible and thus falls under the first step in the *Chevron* analysis. *Chevron*, 467 U.S. at 842. Plaintiff claims that the statute requires Commerce to determine normal value "on the basis of the value of the factors of production . . . [and] the valuation of the factors of production shall be based on the best available information regarding the values of such factors in a market economy country or countries considered to be appropriate by the [Department]." 19 U.S.C. § 1677b(c)(1). Furthermore, the statute provides that Commerce "shall utilize, to the extent possible, the prices or costs of factors of production in one or more market economy countries

. . . ."  19 U.S.C. § 1677b(c)(4).

Nowhere does the statute speak directly to any methodology Commerce must employ to value the factors of production, indeed the very structure of the statute suggests Congress intended to vest discretion in Commerce by providing only a framework within which to work.  The statute requires Commerce to use the best available information, but does not define that term.[5]  *See e.g., Olympia Indus. v. United States*, 7 F. Supp.2d 997, 1000 (1998) ("The relevant statute does not clearly delineate how Commerce should determine what constitutes the [best available information]." (citation omitted)).  If Congress had desired to restrict the material on which Commerce could rely, it would have defined best available information.

Another signal that Congress did not speak and therefore left Commerce discretion in developing the details of its methodology is the phrase "to the extent possible" in defining how Commerce is to value the prices or costs of factors of production.  *See* 19 U.S.C. § 1677b(c)(4). Having decided that the statute grants discretion to Commerce to decide what qualifies as the best available information, the Court proceeds to examine whether Commerce acted reasonably pursuant to the second step in the *Chevron* analysis.  *Chevron*, 467 U.S. at 843.

> *B.  Since the Purpose of the Antidumping Law Is Accurate Calculations of Dumping Margins, Commerce's Use of Import Prices to Value Domestically Purchased Material Must Promote Accuracy to Be Reasonable.*

In the Final Determination, Commerce used the import price paid for steel wire rod, which accounted for 34.7% of all steel wire rod used during the POR, to value the remaining 65.3% of the

---

[5]  The terms best available information and best information available have, on occasion caused some confusion.  *See e.g., Coalition for the Preservation of Am. Brake Drum and Rotor Aftermarket Mfrs. v. United States*, 44 F. Supp.2d 229, 255 n.46 (CIT 1999).

rod purchased domestically. Commerce defended its decision on three grounds. First, Commerce stated that it acted in accordance with an established administrative practice and judicial precedent. *See* 62 Fed. Reg. 61794, 61796. Second, Commerce found the amount of the imported steel wire rod to be significant. *Id.* Third, Commerce found the imported steel to be physically identical to the domestically purchased steel. *Id.*

Despite Commerce's representations, its actions with regard to import price data in this case do not follow clearly established administrative practice nor do they enjoy affirming judicial precedent. At the hearing held on this matter, Defendant's counsel conceded that this was an issue of first impression.[6] *See* Transcript, at 46. Additionally, the judicial decision cited by Commerce in the Final Determination was limited to a situation where Commerce used the cost that manufacturers paid on the international market for the supplies they used. *See Lasko Metal Prods., Inc. v. United States*, 43 F.3d 1442, 1445 (Fed. Cir. 1994). Thus, the issue presented is one of first impression and although the standard of review does not change, the reasonableness of Commerce's new practice lacks judicial support.

Although Commerce claims that the amount of imported steel wire rod used in this case is significant, the Court cannot agree as there is no basis on which to evaluate what Commerce means when it uses the term. In the Final Determination, the only justification of Commerce's finding that the amount of imported steel wire rod was significant was that the imported steel accounted for approximately one-third of all steel wire rod used during the POR. *See* 62 Fed. Reg. 61795, 61796.

---

[6] Commerce's position in the Final Determination and in its brief was that its use of imported purchases to value domestically purchased material was a consistent administrative practice. However, Commerce has never used the import prices of approximately one-third of the input to value the entire input, as it did in this review.

The Court finds Commerce's explanation of the significance of the import volume to be deficient in several respects.  As Commerce itself noted, "the purpose of the antidumping statute is to 'determine margins as accurately as possible.'" *Id.* (quoting *Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185, 1191 (Fed. Cir. 1990); *see also Lasko Metal Prods. Inc. v. United States*, 43 F.3d 1142, 1446 (Fed. Cir. 1994); *Union Camp Corp. v. United States*, CIT Slip Op. No. 99-40 (1999); *Olympia Indus. v. United States*, 7 F.Supp.2d 997, 1000-1001 (1998); *Nation Ford Chem. Co. v. United* States, 985 F. Supp. 133, 135 (CIT 1997);  *Writing Instrument Mfr. Ass'n v. United States*, 984 F. Supp. 629, 637 (CIT 1997).  While Congress has left it within Commerce's discretion to develop methodologies to enforce the antidumping statute, any given methodology must always seek to effectuate the statutory purpose -- calculating accurate dumping margins.  Whether Commerce's use of imported prices to value an entire factor of production is reasonable is inextricably linked to whether the methodology promotes accuracy.  *See e.g., Lasko Metal Prods., Inc. v. United States*, 810 F.Supp 314, 317, 16 CIT 1079, 1081, *aff'd*, 43 F.3d 1442, 1445 (Fed. Cir. 1994) (noting that Commerce's combination of surrogate values and market-based values would be unreasonable if the results were less accurate).  Accuracy may result if a significant amount of the input is imported and if, in that case, Commerce chooses to use the import price to value all of the input.  But contrary to Commerce's claim, here, the use of import prices to value domestically purchased material will not promote accuracy, fairness or predictability unless Commerce explains its finding of significance.  As the matter stands, Commerce defines "significant" as "a meaningful amount, *i.e.*, not insignificant. . . ." 62 Fed. Reg. 61795, 61796.  The Court finds this to be no definition at all.

Whether the use of import prices to value domestically purchased material promotes accuracy, and thus is reasonable under the statute, may indeed vary from case to case.  Of course,

as the amount of imported material actually used in the production of the article approaches 100%, the reasonableness and accuracy of Commerce's determination are enhanced. However, even in those instances, Commerce must not ignore the possibility that use of import prices to value domestically purchased material is somehow distorting, and thus inaccurate. As Plaintiff argues, there was publicly available information indicating that the value or cost of steel obtained from domestic mills in China during the POR was substantially higher than import prices. On remand, Commerce must demonstrate that the use of import prices to value domestically purchased materials promotes accuracy.[7] Therefore, the Court reserves judgment on the reasonableness of Commerce's action until it has the opportunity to explain, with reference to the record, how its use of import prices in this case has led to the calculation of a more accurate dumping margin than any of the alternatives available to it.

In addition to its claim that Commerce's methodology promoted accuracy, fairness and predictability, Commerce argues that it would have been illogical to use different prices for physically identical material. Commerce responded to the Plaintiff's objection to the use of prices paid for imported material to value domestically purchased material, in part, by stating that "[t]here is no evidence that the imported steel . . . should be considered a different factor of production from the domestically-sourced steel." *See* 62 Fed. Reg. 61794, 61796. Yet Commerce has used import prices and surrogate data in the past to value the same factor of production and that practice has been

---

[7] The Court also notes that Commerce's definition of significant does not promote predictability. The rationale to use prices paid on the open market to value an entire factor of production will vary from case to case. Accordingly, it is impossible under Commerce's present approach to significance determinations to foster predictability. The absence of predictability is not fatal to Commerce's methodology, but it enhances the need for Commerce to explain fully, on the record, its grounds for decision.

upheld. *See Lasko Metal Prods. United States*, 43 F.3d 1442 (Fed. Cir. 1994); *see also Melamine*

*Institutional Dinnerware Products from the People's Republic of China*, 62 Fed. Reg. 1708, 1711

(Jan. 13, 1997). Thus, the Court finds Commerce's argument on this point wholly without merit.

*C. Commerce Failed to Examine Whether Good Cause Existed to Verify the Prices Submitted By ZWG.*

Plaintiff argues that in addition to the error committed by Commerce in using the import

prices to value all of the steel wire rod used in the production of the washers, Commerce had good

cause to verify the validity of the price information submitted by ZWG. Defendant's initial response

was that Plaintiff did not request verification, but at oral argument it became clear that since a

verification had been conducted in a prior review, the applicable regulation, 19 C.F.R. § 353.

36(a)(v)(B) (1996), did not provide Plaintiff the right to request verification.[8] *See* Transcript, at 39-

40. Implicit in Commerce's position, particularly evident from oral argument, is that Plaintiff failed

to exhaust its administrative remedies because it never requested verification of the import prices

ZWG submitted.

It is a cardinal principle of administrative law that a court may not consider arguments that

were not made before the agency. *See United States v. L.A. Tucker Truck Line*, 344 U.S. 33, 36-37

(1952) ("We have recognized . . . that orderly procedure and good administration require that

objections to the proceedings of an administrative agency be made while it has opportunity for

correction in order to raise issues reviewable by the courts."). However, the equally well recognized

exception to the exhaustion of administrative remedies rule is that exhaustion is not required where

---

[8] As a result, the only way verification can occur is if the Secretary acts on his own initiative. *Compare* 19 C.F.R. § 353.36 (v) *with* 19 C.F.R. § 353.36(iv).

the efforts of the individual would be futile. *See Hormel v. Helvering*, 312 U.S. 552, 557 (1941); *see also United Black Fund, Inc. v. Hampton*, 352 F. Supp. 898, 902 (D.D.C.1972) ("[I]t is well settled that an action should not be dismissed for failure to exhaust administrative remedies when an attempt to gain the desired relief from the agency in question would obviously be a futile act ."); *accord Rhone Poulenc, Inc. v. United States*, 7 CIT 133, 583 F. Supp. 607 (1984). Moreover, 28 U.S.C. § 2637(d) grants the court discretion in deciding when requiring exhaustion is appropriate. *See United States v. Priority Prods., Inc.*, 793 F.2d 296, 300 (Fed. Cir. 1986).

Here, it is clear that even if Plaintiff had requested verification, the regulation gives an interested party the right to request it only if "[t]he Secretary conducted no verification . . . during either of the two immediately preceding administrative reviews." 19 C.F.R. § 353.36(a)(v)(B). Since a verification occurred during the first administrative review, Plaintiff did not have the right to request verification under the ITA's regulations. Therefore, on remand, Commerce should reconsider its use of unverified import price information and explain why good cause does not exist to verify the prices ZWG submitted, especially since Commerce seeks to use the information to value all of the steel wire rod used in the production of the washers.

*D. Commerce's Decision to Use the March 1996 Indian Import Statistics to Value Steel Scrap Is not Supported By Substantial Evidence.*

Plaintiff submits that Commerce's use of certain March, 1996, Indian import data for steel scrap was aberrational and should have been excluded because Indian imports from Germany, Korea and the United Kingdom distorted the March unit value for steel scrap. Indeed, Plaintiff points to a subsequent determination by Commerce in an unrelated investigation where the identical data was found to be aberrational. While the Defendant is correct that the subsequent review is beyond the

record of this case, its importance is in Commerce's acknowledgment that its administrative practice with respect to aberrational data is "to disregard small-quantity import data when the per-unit value is substantially different from the per-unit values of the larger quantity imports of that product from other countries." *See* 63 Fed. Reg. 16758, 16761 (citing *Heavy Forged Hand Tools, Finished or Unfinished, With or Without Handles, from the People's Republic of China, Final Results of Administrative Reviews*, 62 Fed. Reg. 11813 (March 13, 1997); *Tapered Roller Bearings and Parts Thereof, Finished or Unfinished, from Romania, Final Results of Antidumping Duty Administrative Review*, 62 Fed. Reg. 37194 (July 11, 1997). Thus, the practice referred to by Commerce existed prior to the effective date of the Final Determination. Commerce failed to follow its administrative practice because the record demonstrates that the import prices for steel scrap derived for India were compared to prices in other countries. *See* A.R. 50. It was through this comparison that Commerce found the Indian import prices for steel scrap not to be aberrational, although the record discloses the Indian price to be the highest of all the countries examined, except for Indonesia, which appears to be clearly aberrational. *See* A.R. 50, at 8. Here, Commerce failed to follow its administrative practice of excluding "small-quantity import data when the per-unit value is substantially different from the per-unit values of the larger quantity imports of that product from other countries." The Court finds Commerce's decision to retain the March 1996 import data is not based on substantial evidence. On remand, Commerce must recalculate the Indian steel scrap figure by making the appropriate adjustments in accordance with its administrative practice to discard any aberrational figures.

*E. Plaintiff Has not Met Its Burden On Its Claim that Commerce Failed to Disregard Data Regarding Paper Cartons.*

In a footnote on the final page of its moving brief, Plaintiff raises an argument that Commerce failed to disregard aberrational data regarding paper cartons imported into India. As the Defendant correctly noted in its response, the burden of proving Commerce's determination incorrect lies with the party challenging the determination. *See* 28 U.S.C. § 2639(a)(1). The Plaintiff did not address the Indian paper carton issue at all in its reply. The Court finds the Plaintiff has failed to meet its burden on this issue and upholds the decision of Commerce to use certain Indian data regarding paper cartons.

*F. Commerce Must Delete the Duplicate Data for April 1995 - August 1995 When Recalculating the Steel Scrap Value Factor.*

It is uncontested that Commerce erred in its calculation of the surrogate value for steel scrap by using the incorrect total quantity and value figures for April 1995 - August 1995. Commerce has agreed to delete the duplicate figures and recalculate the steel scrap factor along with the additional recalculation discussed above.

## IV. CONCLUSION

For the foregoing reasons, the Court grants Plaintiff's Motion in part, denies it in part and remands. An order so stating will be entered accordingly.

Dated: _____ _____
     New York, NY           Judith M. Barzilay
                                         Judge